UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                                                                    04 Cr. 877 (RPP)

        - against -                                                      **OPINION & ORDER**

SERGIO MOLINA AND FRANK TAYLOR,

                                Defendants.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       By motion dated January 8, 2005, Defendant Frank Taylor ("Taylor") moved to suppress physical evidence seized from a luxury bus on which he was traveling, and statements he allegedly made on July 17, 2004.[1] On March 23, 2005, the Court held an evidentiary hearing to determine whether there were facts sufficient to suppress the evidence seized as a result of the stop of the bus. Immediately after hearing argument on the motion on March 31, 2005, the Court denied Taylor's motion to suppress the physical evidence seized from the bus but did not rule on Taylor's motion to suppress his pre-arrest statements. For the reasons that follow, Taylor's motion to suppress those statements is now denied.

**BACKGROUND**

       On July 17, 2004, based on information gathered by the New York Drug Enforcement Task Force, two New Jersey state law enforcement officers pulled over a luxury bus in which Taylor, along with Sergio Molina, Francisco Yanez, Marcos Rojas,

---

[1] Taylor's motion incorrectly describes the events that gave rise to this motion as occurring on July 7, 2004, and his affidavit incorrectly describes the events as occurring on July 18, 2004.

and the driver of the bus, were traveling. Detective Sergeant Joseph Serrao and Trooper Archer Jones pulled the bus over at approximately 4:00 p.m. while it was driving westbound on Interstate 80 in New Jersey a few miles from the Delaware border. (Tr. at 12-13.)[2] Serrao approached the bus on the shoulder of the highway and explained to the driver and Taylor that he stopped the bus to conduct a bus inspection. (Id. at 13-15.) Serrao then directed the bus driver to follow his marked vehicle off the highway to a better location to conduct the inspection. (Id. at 15.)

Serrao led the bus to a truck weigh station that was 300 to 400 yards away and not being used at the time. (Id. at 15, 64.) After reaching the weigh station, Serrao first had a conversation with the bus driver, who directed all of the occupants to exit the bus. (Id. at 16, 65.) Once outside, Serrao told the occupants to stand in an area between the bus and Serrao's marked vehicle. (Id. at 67.) At that time, Jones and two state troopers who had arrived at the weigh station were positioned between ten and twenty-five feet from the occupants. (Id. at 77-78.) Serrao obtained consent to search from the driver and then contacted two members of the surveillance team, Detective Sergeant Glenn Lubertazzi and Detective Sergeant Scudder, and asked them to come to the scene. (Id. at 21, 79, 81.) Serrao also talked to the other four occupants collectively and explained that he needed them to identify their bags in the luggage compartment, which they did. (Id. at 20-21.)

Shortly thereafter, Lubertazzi and Scudder arrived at the weigh station and began interviewing the occupants of the bus. (Id. at 22-23, 135.) One by one, Lubertazzi spoke separately to each occupant a short distance from where the others were standing. After asking each occupant to identify his bag, Lubertazzi read a standardized consent to search

---

[2] References to "Tr." are to pages of the transcript of the suppression hearing held on March 23, 2005.

2

form to the occupant and asked him to sign it. (Id. at 169, 172-73.) Once a consent form was signed, Lubertazzi searched the corresponding bag. This process continued for approximately two hours after the bus was initially stopped (id. at 123, 124, 144, 181), during which time the bus driver, Taylor, Molina, Yanez, and Rojas remained in the area between the bus and Serrao's vehicle (id. at 175-76). Additional law enforcement officers arrived at the weigh station during the course of the searches; as many as nine law enforcement officers were present at the scene by the time Lubertazzi began to search the final bag, which had been claimed by Rojas. (Id. at 119, 124.)

Upon searching Rojas's bag, Lubertazzi found, inter alia, a large amount of U.S. currency wrapped in black heat sealed bags concealed inside the wall of the suitcase. (Id. at 141-42.) At the evidentiary hearing, Lubertazzi testified that "[w]hen I started pulling out the money [Taylor] said it was his, that Rojas was holding it for him." (Id. at 143.) Later in his testimony, Lubertazzi stated, "I was pulling [the money] out, then I showed I believe Detective Scudder, I think we got some cash. We started talking about it. That's when we were interrupted by Mr. Taylor. He said it was his." (Id. at 178.) According to Lubertazzi, Taylor made the statement after Lubertazzi had broken the wrapping and exposed the money so that it could be seen. (Id. at 179.) Serrao also heard Taylor declare that the money was his after Lubertazzi discovered it. (Id. at 122.)

After Taylor stated that the money in Rojas's bag was his, Lubertazzi testified that, "I believe I asked him why, if it was his money, why was he holding—why he was he claiming that money." (Id. at 179.) Taylor responded by saying something about the recording industry and, according to Lubertazzi, "[h]e stated to me at this time that he had an additional $300,000 on the bus in a red bag." (Id.) Serrao recounted the exchange

3

between Taylor and Lubertazzi somewhat differently. Serrao testified that Lubertazzi asked "what's this" to which Taylor responded that the money was expense money for the trip (id. at 125); Serrao also testified that Lubertazzi asked how much was in the bag and Taylor said "about $300,000" (id. at 127).

Immediately after Taylor responded to Lubertazzi's questioning about the money, Taylor, Molina, Yanez, and Rojas were placed under arrest and informed of their Miranda rights. Taylor was subsequently charged with conspiracy to distribute and possess with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B), and conspiracy to launder narcotics proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

At issue here is the admissibility of the statements Taylor made after the money was discovered in Rojas's bag but before he was placed under arrest. At argument, Taylor sought to suppress these statements on the grounds that they were the result of a custodial interrogation and he had not been advised of his Miranda rights.

**DISCUSSION**

Miranda warnings must be given to a suspect in custody and subject to official interrogation. Illinois v. Perkins, 496 U.S. 292, 297 (1990). "Custodial interrogation exists when a law enforcement official questions an individual and that questioning was (1) conducted in custodial settings that have inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak, [Miranda v. Arizona, 384 U.S. 436, 467 (1966)] (the in custody requirement) and (2) when the inquiry is conducted by officers who are aware of the potentially incriminatory nature of the disclosures sought (the investigative intent requirement)." United States v. Rodriguez,

4

356 F.3d 254, 258 (2d Cir. 2004) (quoting United States v. Morales, 834 F.2d 35, 38 (2d Cir. 1987)).

The determination of whether a suspect was "in custody" for the purposes of Miranda requires a two-step inquiry. See United States v. Newton, 369 F.3d 659, 672 (2d Cir. 2004). The first step in the inquiry is to ask "whether a reasonable person would have thought he was free to leave." Id. If a reasonable person would not have throught himself free to leave, the next question to ask is "whether, in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." Id. Despite observing that "few motorists would feel free . . . to leave the scene of a traffic stop without being told that they might do so," the Supreme Court has held that ordinary vehicle stops do not curtail a suspect's freedom "to a degree associated with formal arrest." Berkemer v. McCarty, 468 U.S. 420, 436-41 (1984).

The Supreme Court has defined "interrogation" as express questioning initiated by law enforcement officers or its "functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). The functional equivalent of express questioning includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. (footnotes omitted). However, the Miranda Court emphasized that "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." Miranda, 384 U.S. at 478.

Taylor argues that his statement declaring ownership of the money Lubertazzi found in Rojas's bag is inadmissible because he was in custody and subject to interrogation when he made it. With regard to the "interrogation" requirement, Taylor contends that he made the statement in response to Lubertazzi's earlier questioning about which bag was his and whether the bag contained any large sums of money. However, the testimony indicated that approximately an hour and a half had elapsed since Lubertazzi questioned Taylor about his bag—in the meantime, Lubertazzi had gone on to question Yanez and Molina about their bags and search those bags, and then to question Rojas about his bag and search it. Moreover, Lubertazzi testified credibly that, after he unwrapped one of the sealed packages of money that was concealed in Rojas's bag, Taylor spontaneously declared that the money was his. In addition, although Taylor may have been as close as five feet away from where Rojas's bag was searched (Tr. at 174, 179), the testimony does not suggest that Lubertazzi—or any other law enforcement official at the weigh station—said or did anything that was reasonably likely to elicit any statement from Taylor. Accordingly, because Taylor's statement asserting ownership of the money found in Rojas's bag was voluntary and spontaneous, the Court finds that it was not the result of an unconstitutional interrogation.

Taylor next argues that the statements he made immediately after declaring ownership of the money but prior to his formal arrest are not admissible because he was in custody at the time and the statements were in response to questioning by Lubertazzi. Lubertazzi testified that the following exchange occurred after Taylor stated that the money was his: "I believe I asked him why, if it was his money, why was he holding—why he was he claiming that money." (Id. at 179.) According to Serrao, immediately

6

after Taylor declared ownership of the money, Lubertazzi said "what's this" (id. at 125, 127), and "how much is it" (id. at 127). Although the testimony about Lubertazzi's exact words is not entirely consistent, the Court finds that after Taylor declared ownership of the money, Lubertazzi elicited Taylor's subsequent statements by asking about the money. Thus, Taylor was subject to "interrogation" and his subsequent statements must be suppressed if he was "in custody" when they were made.

The testimony demonstrated that Taylor was not "in custody" when he responded to Lubertazzi's question about the money. To be sure, by the time Taylor made the statements at issue, approximately two hours had elapsed since the bus was stopped on the highway (id. at 123, 124, 144, 181) and the number of law enforcement officers at the weigh station had increased from two to nine (id. at 119, 124). On the other hand, Lubertazzi and Serrao testified that the law enforcement officers at the weigh station did not draw their weapons or handcuff Taylor or the other occupants of the bus prior to the formal arrest. (Id. at 126, 135.) In addition, despite the number of law enforcement officers present at the weigh station, the testimony did not suggest that they were positioned around Taylor and the other occupants of the bus in such a way that a reasonable person would believe he was being held or under arrest. (Id. at 77-78.) Instead, while Lubertazzi searched the bags Taylor and the other occupants were permitted to talk freely amongst themselves, stand around or sit on the bumper of the bus or Serrao's vehicle, and drink bottled water brought to them from the bus. (Id. at 105.) Lastly, although Taylor and the other occupants were not specifically told so, both Lubertazzi and Serrao testified that they were free to leave before they were formally arrested (id. at 92, 183-84); to that end, the Court notes that the consent to search form

7

that Lubertazzi read to Taylor and Taylor signed before his bag was searched included the following statement: "I have been advised by DSG G. LUBERTAZZI #4636 and fully understand that I have the right to refuse giving my consent to search and may depart if no other reason exists for detaining me." (New Jersey State Police Consent to Search Forms, admitted as Government's Exhibit 7.) Accordingly, the Court concludes that Taylor was not "in custody" for <u>Miranda</u> purposes when he made his statements regarding the money found in Rojas's bag because a reasonable person would not have "understood his freedom of action to have been curtailed to a degree associated with formal arrest." <u>Newton</u>, 369 F.3d at 672. For this reason, Taylor's response to Lubertazzi's questions about the money is admissible even though he had not yet been informed of his <u>Miranda</u> rights. The Court notes, however, that unless it receives a proffer from the Government showing the relevance of Taylor's statement about having $300,000 in a bag on the bus, testimony about this admission will not be allowed at trial, pursuant to Rules 401, 402, and 403 of the Federal Rules of Evidence.

**CONCLUSION**

For the foregoing reasons, the Defendant's motion to suppress testimony concerning the statements he made prior to his arrest is denied.

IT IS SO ORDERED.

Dated: New York, New York
May 10, 2005

                                              Robert P. Patterson, Jr.
                                              U.S.D.J.

Copies of this Opinion & Order sent to:

David N. Kelley, United States Attorney
Southern District of New York
Attn: William C. Komaroff
One St. Andrew's Plaza
New York, NY 10007
Tel:    212-637-1111
Fax:    212-637-2429


For Defendant:

Alan M. Nelson
3000 Marcus Avenue, Suite 1E5
Lake Success, NY 11042
Tel:    516-328-6200
Fax:    516-328-6354